<hr />

HEARD APRIL TERM, 1877.

### STATE OF SOUTH CAROLINA *vs.* BUTTZ.

1. A Solicitor who accepts the office of Representative in Congress thereby vacates his office of Solicitor.
2. Where one holding an office accepts another which is incompatible therewith, he thereby vacates the first.
3. There is nothing in the Constitution of this State which abrogates the common law rule that the same person cannot hold at the same time two incompatible offices.
4. The office of State Solicitor and Member of Congress are incompatible with each other.

This was an information filed in the Supreme Court to oust the defendant from the office of Solicitor of the First Circuit of the State.

The case is fully stated in the opinion of the Court.

*W. Jervey,* for relator:

It appears from the evidence that Charles W. Buttz was a candidate for the office of Solicitor of the First Judicial Circuit at the

election of November 7th, 1876, and, claiming to have been elected, filed his bond, and on November 30, 1876, received from Daniel H. Chamberlain, Governor of South Carolina, his commission as such Solicitor; and that subsequently, to wit, at the first sitting of the Court of General Sessions for Charleston County, in said Circuit, he appeared and duly entered upon the discharge of the duties of said office. It further appears that the said Charles W. Buttz was at the same election likewise a candidate to fill the unexpired term of Representative of the State of South Carolina to the Forty-fourth Congress, and that after he had received his commission as Solicitor as aforesaid and entered upon the duties of the said office, he did, on or about the 23d day of January, 1877, qualify as Representative to Congress and took his seat as such. We claim:

1st. That the two offices of Solicitor of the First Judicial Circuit of the State of South Carolina and Representative of the State of South Carolina in Congress are incompatible; and, .

2d. That two incompatible offices cannot be performed by one and the same individual; and the acceptance of the latter of two such offices forfeits and makes vacant the former.

1. As to the incompatibility of the two offices—

5 Bac. Abr., 205: "Offices are said to be incompatible and inconsistent, so as to be executed by the same person, when, from the multiplicity of business in them, they cannot be executed with care and ability, or when their being subordinate and interfering with each other it induces a presumption they cannot be executed with impartiality and honesty."—4 Inst., 100.

Under the first division of this definition come the two offices in question. The duties to be performed in the one require the residence of the incumbent in Washington for at least a considerable portion of the year, besides which he is at all times subject to the call of the United States government for a meeting of Congress; while it is required by law that the other (the Solicitor) shall *reside* within his Circuit. (Con., Art. IV, § 29.) And the amount of business in either position would make it impossible for the same individual to execute the duties of the other office with "care and ability."

Nor can the incumbent claim that while attending to his duties in the one office in his own person he may conduct the business of the other by deputy. It will not be contended that he may send his deputy to Congress.

Can the Solicitor perform his office by deputy?

5 Bac. Abr., 207: "A judicial officer cannot, it is said, make a deputy, unless he hath a clause in his patent to enable him, because his *judgment* is relied on in matters relating to his office, which might be the reason of the making of the grant to him. Neither can a ministerial officer depute one in his stead if the office be to be performed by him in person; but when nothing is required but a superintendency in the office he may make a deputy."

The office of Solicitor is instituted by the fourth Article of the Constitution, which treats of the "judicial department;" and it is clear, from a consideration of his duties, that he is in fact, as well as in design, a judicial officer. To his judgment and *judicial discretion*, in the first instance, are submitted all questions involving the lives and liberties of the people of his circuit, and on his personal attainment and knowledge of the law, to a great extent, depends the protection of the people against crime and lawlessness. Even if, however, it be denied that the Solicitor hold a judicial office, yet the office is certainly one of "trust and confidence," whereof there can be no deputy.—2 Jacobs' L. D., 252. Furthermore, with regard to certain other elective officers, such as Sheriff, Clerk and Coroner, there are statutory provisions authorizing the appointment of deputies, (Rev. Stat., Ch. XX, § 11; Ch. XXII, § 1; and Ch. XXI, § 6,) while no such power is given the Solicitor; on the contrary, the Circuit Judge is authorized by law to appoint a Solicitor *pro tem.* in the event of an absence of the incumbent or a temporary vacancy.

2. Two incompatible offices cannot be held by one and the same individual, and the acceptance of the latter of two such offices forfeits and makes vacant the former.—5 Com. Dig., 190. "So the grant of an office to one who has another office incompatible is not good, for the first office will thereby be void."—Doug., 398. "So a man shall lose his office if he accept another office incompatible."—Dyer, 197.

In *The King* vs. *Godman*, it is stated "that if the two offices are incompatible then the acceptance of the higher, *ipso facto*, vacates the other."—Doug., 398, (note). And this rule, says Lord Coke, "is of that importance that if all civil offices were only executed, each by a different person, it would be for the good of the com-

monwealth, advancement of justice and preferment of deserving men."

In *Milward* vs. *Thatcher*, Buller, J., says: "If they be incompatible, the election to the latter office is good, because the *acceptance* of the second vacates the first office.    *    *    *    * If the two offices be incompatible, the acceptance of the latter vacates the former."

And, likewise, Amherst, J., in the same case says: "I think that the acceptance of the latter does *absolutely and ipso facto* avoid the former, although the superior office, if they be incompatible."—2 T. R., 81.

And in *The King* vs. *Sir W. Trelawney*, Lord Mansfield says: "It seems to me very strong that if these two offices were incompatible the acceptance of the latter would imply a surrender of the former."—3 Burr., 1616.

So much for the English law on this subject. In America, where offices are not in the gift of a crown, but where the sovereignty resides in the people, this plurality of office is looked upon with even more disfavor than in England. Here, too, there is no power to compel a person to accept an office. He cannot prevent the people voting for him for any number of offices they see fit; but he is not obliged to accept any one of them, and if he does he must elect which office he will accept if they are incompatible. This distinction is illustrated by the case of *Rex* vs. *Patterson*, 4 B. & Ad., (24 Com. Law R., 11,) wherein it is decided that the "acceptance of an incompatible office does not operate as an absolute avoidance of a former office in any case where the party could not divest himself of that office by his own act." This exception does not find expression in our books, and is not necessary in the United States, where every man is free to accept or resign any office to which he may be elected without the permission or acquiescence of the sovereign power.

It is laid down in McCrary's Am. Law of Elections, Section 253, as the general rule, that "an office may be abandoned by removal from the State, County or district to which the officer is restricted by the law of his office; by *accepting an incompatible office;* or by the relinquishment of any express qualification; or by the assumption of any absolute disqualification, or by resignation."

McCrary's Am. Law of Elections, Sections 238, 239: "Whether the incumbent of an office becomes disqualified by accepting

another depends upon the question whether the law forbids the holding of the two offices by the same person; and if not, then upon the further question whether the functions and duties of the two offices are incompatible.   *    *    *   If there is a statutory or constitutional provision prohibiting the same person from holding both offices at the same time, then, of course, the question of their incompatibility does not necessarily arise, for in such a case the acceptance of the second is *ipso facto* the abandonment and resignation of the first, though the duties of the two may be entirely compatible. But if the statute and Constitution are silent upon the subject, then the question whether the two offices can be held at the same time by the same person *depends upon their compatibility."*

For example, suppose A. B. were the successful candidate for Sheriff and Clerk of the Court at the same election. There is no constitutional nor statutory provision forbidding A. B. from accepting and discharging the duties of both these offices; and yet it would hardly be contended that he could act in both capacities and draw the emolument of both offices at the same time, because these offices are incompatible; and the case in point is even more exaggerated than this, because the duties of Sheriff and Clerk may be performed in the same County, perhaps in the same building, while the duties of the Solicitor and member of Congress must be performed in different portions of the United States. Moreover, these two offices are in different departments of government, the one being judicial and the other legislative, the holding of which by one person is contrary to the spirit of our laws, as evinced by that constitutional provision which provides that the three departments of government "shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other."—Con., Article I, § 26.

Extract of Dawes's Report on cases of Schenck and Blair in United States House of Representatives.—McCrary, Sec. 242.

McCrary, § 243: "There can be no doubt but that the *accepting* of the office of Representative in Congress and entering upon the discharge of its duties amounts to a *resignation and ·abandonment of any incompatible office* previously held, and hence a formal resignation is not necessary in any such case."

*People,* ex rel. *Martin,* vs. *Board of Police.*—35 Barb., 553.

*Melton & Wingate,* contra :

1. The right of the elector in this State to hold more than one office, State or Federal, as a general proposition, is definitively declared by the express provisions of the Constitution.

In Section 21, Article I, it is provided that "every inhabitant of this Commonwealth possessing the qualifications provided for in this Constitution shall have the right to elect officers and be elected to fill public office." And in Section 7, Article VIII : "Every person entitled to vote at any election shall be eligible to any office which now is, or hereafter shall be, elective by the people in the County where he shall have resided sixty days previous to such election, *except as otherwise provided in this Constitution* or the Constitution and laws of the United States." Whilst there is no provision in general terms restricting the right so declared to a single office, there are several exceptions limiting the right to hold more than one office in particular instances, which serve, whilst declaring what offices are to be deemed incompatible, to approve the rule that, as a general proposition, offices are not incompatible. Incompatibility of office is the exception, not the rule. These limitations are :

*a.* No person exercising the functions of any one of the three departments of the government of this Commonwealth, legislative, executive or judicial, shall assume or discharge the duties of any other.—Art I, § 26.

*b.* Any person who shall fight a duel, or send or accept a challenge for that purpose, &c., shall be deprived of holding any office of honor or trust in this State.—Art. I, § 32.

*c.* No person is eligible to a seat in the Senate or House of Representatives who has not been a resident of his County for *three months* next preceding the election, or who has been convicted of an infamous crime. Senators shall be at least twenty-five years of age.—Art. II, § 10.

*d.* No person shall be eligible to a seat in the General Assembly whilst he holds any office of profit or trust under this State, the United States, or any of them, or under any other power, except officers in the militia, Magistrates or Justices of inferior Courts whilst such Justices receive no salary. And if any member shall accept or exercise any of the said disqualifying offices he shall vacate his seat.—Art. II, § 28.

*e.* No person shall be eligible to the office of Governor who denies the existence of a Supreme Being; who is not thirty years of age, and has not been a citizen of the United States and a citizen and resident of this State for the two years next preceding the day of election. *No person while Governor shall hold any office or commission (except in the militia) under this State, or any other power, at one and the same time.*—Art. III, § 3. The Lieutenant Governor shall be possessed of the same qualifications.—Art. III, § 5.

*f.* A member of the Senate or House, being chosen and acting as Governor or Lieutenant Governor, shall thereupon vacate his seat.—Art. III, § 8.

*g.* The Judges of the Supreme Court and Circuit Courts shall not hold any other office of trust or profit under this State, the United States or any other power. Such Judge must be a citizen of the United States, thirty years of age and a resident of the State for five years next preceding his election.—Art. IV, §§ 9, 10.

*h.* A Sheriff or Coroner is disqualified for a second term if it appear that he is in default for moneys collected by virtue of his office.—Art. IV, § 30.

*i.* No person shall be allowed to hold office who is or may be disqualified therefor by the Constitution of the United States until such disqualification be removed, or while in any alms house or asylum, or of unsound mind, or confined in any public prison.— Art. VIII, § 2.

*j.* Any officer charged with the safekeeping, transfer and disbursement of State, County and school funds who shall embezzle the same shall be deemed guilty of felony, and, upon conviction, "shall be disqualified from ever holding any office of honor or emolument in this State," unless such disability be removed by the General Assembly.—Art. IX., § 15.

*k.* No person shall be elected or appointed to any office in this State unless he possess the qualifications of an elector.—Art. XIV, § 1.

*l.* No person who denies the existence of a Supreme Being shall hold any office under this Constitution.—Art. XIV., § 6.

Several of these limitations affect the eligibility of the elector in other relations, but most of them have direct reference to incompatibility of offices: 1. The offices of the different departments are incompatible; 2. That of a member of either branch of the General Assembly is incompatible with any other, save in three particulars; 3. The Governor cannot hold any other office, except in the

militia; 4. The Lieutenant Governor is subjected to the like qualifications; 5. The member chosen Governor shall vacate his seat; 6. Judges are disqualified for any other office. And it will further be observed that in several instances the same disqualifications are repeated in different Articles with emphasis.

The framers of the Constitution have thus given to this subject— the qualifications for office—especial consideration, and provided with exceptional care exact and repeated expression of the particulars in which offices are forbidden to be held by the elector and of the instances in which they shall be deemed incompatible.

*Expressio unius, exclusio alterius,* is an acknowledged canon of constitutional construction. As expressed by Judge Story (Const., § 448,) " A specification of particulars in an instrument is the exclusion of generals," and " a negative provision in a particular case admits the existence of the same thing in every other case." As Lord Bacon has it, " an exception strengthens the force of a law in cases not excepted." Judge Story, Const., § 449: " There can be no doubt that an affirmative grant of powers in many cases will imply an exclusion of all others. As for instance: The Constitution declares that the powers of Congress shall extend to enumerated cases. This specification of particulars evidently excludes all pretensions to a general legislative authority, because an affirmative grant of special powers would be absurd as well as useless if a general authority were intended." The correlative proposition holds for a stronger reason—the denial of a right in particulars affirms the right in general; because if the right did not exist in general, the denial in special instances " would be absurd as well as useless." It was easy for the Constitution to declare, if it were so intended, that no elector should hold two offices, State or Federal, at the same time, except officers of the militia, Magistrates and Judges of inferior Courts, and this would have covered the whole ground in a single sentence. It is not so written, because it was intended that the elector should have the right to hold more than one office, except in the several particulars here and there enumerated.

But " where the intent is plain, nothing is left to construction," says Chief Justice Marshall.—2 Cranch, 386. The Constitution declares in express terms, easily understood, that the elector shall be eligible to any office " except as otherwise provided in this Constitution;" and the cases where he is not eligible because of holding an incompatible office are distinctly " otherwise provided in this

Constitution." The whole question is here concluded, if the Constitution is to be the supreme law of this Court.

The legislative power to add to or restrict these provisions is equally denied. They may be restricted by either *the laws* or the Constitution of the United States ; but, in the State, by the Constitution alone. But strike out this exception and the provision would remain complete and conclusive. " When the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to .the condition or to extend the penalty to other cases. On this ground it has been held that where the Constitution defined the qualifications of an officer it was not in the power of the Legislature to change or superadd to them unless the power to do so was expressly or by necessary implication conferred by the Constitution itself."—*Thomas* vs. *Owens*, 4 Md., 189 ; Cooley Con. Lim., *64, and cases there cited. Here the power is not only not conferred, but is specifically denied.

If the authority to add to these limitations or to prescribe another rule of qualification for office be denied to the legislative power, either expressly or by implication, will it be conceded to the Court ? May the Court find a law higher than the Constitution and set aside the express provisions of the fundamental law in obedience to its own conception of public policy ?

It is said to be curious that, in the absence of any express provision in the Constitutions, the judiciary should have assumed to exercise the extraordinary power of checking Legislatures to the extent of declaring statutes to be null and void when passed in violation of constitutional restrictions.—Potter's Dwarris, 366. But the jurisdiction in this respect is now universally conceded, and it is said that " those who controvert the principle that the Constitution is to be considered in Court as a paramount law are reduced to the necessity of maintaining that Courts must close their eyes on the Constitution and see only the law. This doctrine would subvert the very foundation of all written constitutions."—*Ib.*, 365. But it is not for the Courts to hold a law to be void which is not prohibited by the Constitution, because in their opinion it violates the spirit of our institutions or impairs any of those rights which it is the object of a free government to protect; nor can they declare it to be unconstitutional because it is morally wrong or unjust. The Constitution itself contains all the inhibitions that exist against

legislative action. If the Courts can add to these, they *alter* this fundamental instrument, which they are not authorized to do, and themselves become the aggressors, and violate both letter and spirit of that organic law as grossly as the Legislature could.—21 Penn., 167. If the Courts can add to the things that are inhibited, they can also take away. If they can change at all, they can destroy entirely. They cannot supply what they may suppose a *casus omissus* in the Constitution, nor declare' unconstitutional an Act which they conceive to be wrong, unjust or oppressive. They cannot inquire whether the Legislature has violated the genius of government, or the general principles of liberty, or the rights of man, or whether these acts are wise or expedient, but only whether the Legislature has transcended the limits prescribed by the fundamental law.—Potter's Dwarris, 369, and cases cited. The restrictions (or other provisions) may be regarded as inconvenient and as interfering with favorite policies, but in this respect the remedy lies in the power of amendment rather than by a hazardous extension of the power of construction, which would be in effect the making of a constitution the people have not made. Such an act of construction by a Court would be a usurpation of functions not committed to them. "The sound principle is to declare *ita lex scripta est;* to follow and obey. It should be, so far at least as human infirmity would allow, not dependent upon the prejudices and excitements growing out of particular policies, nor upon the passions of parties of particular times, but the same yesterday, to-day and forever."— Story Con., § 426.

If this be the rule of judicial action in reference to statutes, and they are beyond the power of the Court except where they conflict with the Constitution, where is the warrant of authority upon the like pretexts to disregard the Constitution itself? To do this, we repeat, is to assume a right to change the Constitution; to supply what we might conceive to be its defects; to fill up every *casus omissus;* and to interpolate into it whatever in our opinion ought to have been put there by its framers."—*Sharpless* vs. *The Mayor,* 21 Penn., 147.

The argument of such a proposition would be unpardonable, if it were possible to conceive any other upon which the Attorney General can rely in support of the case before the Court. Resort must be had to some imaginary doctrine of the common law which, *ab inconvenienti,* will authorize this Court to do what the fundamen-

tal law has forbidden. "Constitutions are to be construed in the light of the common law, and of the fact that its rules are still in force. By this we do not mean that the common law is to control the Constitution, or that the latter is to be warped and perverted in its meaning in order that no inroads, or as few as possible, may be made in the system of common law rules; but only that for its definitions we are to draw from that great fountain, and that, in judging what it means, we are to keep in mind that it is not the beginning of law for the State, but that it assumes the existence of a well-understood system which is still to remain in force and be administered, *but under such limitations and restrictions as that instrument imposes.*"—Cooley on Con. Lim., 61.

2. There is nothing in the "Constitution and laws of the United States" to qualify or in any manner restrict the provisions of the Constitution of this State touching the issue in this case.

In the sixth Section of the first Article, it is provided that " no Senator or Representative shall be appointed to any civil office under the authority of the United States *which shall have been created or the emoluments whereof shall have been increased during such time;* and no person holding any office under the United States shall be a member of either house during his continuance in office."

In Section 1, Article II, "No Senator or Representative, or person holding office of trust or profit under the United States, shall be appointed an elector " of President or Vice President.

The implications to be adduced from the fact of an express affirmative provision in a State constitution do not apply with equal force to the Federal Constitution, the latter being a grant of limited powers. It is sufficient to show that the right to hold offices under each government contemporaneously is not denied, except in the instance stated, and this must be strictly construed.

If any implication can be made, it is that the holding of an office under the United States renders the member ineligible to a seat—not that the qualification of a member shall operate to vacate the former office. But all this does not apply.

In the earlier times there existed extreme jealousy between the States and the general government, which created a public sentiment against the officer of the one at the same time holding office under the other, and statutes were very generally passed to prevent it—it being conceded then that there existed no inherent

incompatibility, nothing of inconsistency in the nature and reason of the thing outside of statute. To this jealousy the Pennsylvania cases refer, (4 Dall., 229; 17 Serg. & Rawls, 219; 5 Bar., 67;) and an exhibition of it was early made in South Carolina, (5 Stat. at Large, 20.) But the public sentiment is now changed. The Federal government is not a foreign power and does not antagonize the States. The contrary is the law. These are empires within an empire, all in harmonious action; and the reason of the thing would seem to encourage the idea that, the officer being competent and well-disposed, his official identification with both governments would tend to promote the order, concord and peace which are the vital elements of the national life.

II. The complaint bases the action upon the ground that the offices in question are *incompatible;* that is to say, that the duties of the two offices cannot be performed by the same person, and, therefore, by accepting the latter, the defendant has "vacated, surrendered and forfeited" the former. Accepting the premises as stated, the defendant has not, strictly speaking, *vacated* or *surrendered* or *forfeited* his office. This is a matter for technical precision. If the defendant has accepted an incompatible office, he is said to have *resigned* the former office; if he has accepted two offices, the duties of which, although not incompatible, cannot for another reason be performed by the same individual, he must be said to have *abandoned* the office first taken; at any rate, we propose to use the terms in this sense.—Angell & Ames on Cor., § 433, *et seq.;* 1 Dill. Municip. Cor., § 164. In either event the effect may be the same; the principles of law applied to the cases are radically different.

1. The learning on this subject applies the term *incompatible* most frequently to corporate offices belonging to the same corporation, where it is defined thus: "Where different persons, filling two offices, would be in the relation of master and servant to each other, such offices are incompatible and cannot be held together by the same person."—Cole on Quo Warranto, *156; or, to refer to the quaint black letter, "where the one has controlment of the other."—Vin. Ab. Officers, R. 3. Whatever may be the cause which renders it impossible for the same person to hold two offices together, they are not, in legal phrase, held to be incompatible, unless the duties of the one impinge upon, conflict with and are inherently inconsistent with and contrary to each other as to the

nature of the duties of each. They must be in intimate relation the one to the other, so that at any time the duty of the one may be in antagonism to the duty of the other.

A reference to the cases will make this plain. The office of Alderman and Town Clerk of a borough are incompatible, and therefore an Alderman vacates his office by accepting the appointment of Town Clerk.—*Rex* vs. *Pateman*, 2 T. R., 777; *Rex* vs. *Tizzard*, 9 Barn. & Cres., 418. So with Justice of the Peace and Overseer of the Poor.—*King* vs. *Gayer*, 1 Burr., 245. So a Jurat and Town Clerk.—*Millward* vs. *Thatcher*, 2 T. R., 81. So the Town Councillor and Clerk of the Court of Requests.—*Staniland* vs. *Hopkins*, 9 Mee. & W., 178. These cases went on the ground that the offices were of the same corporation; the higher elected the lower, or paid him, or audited his accounts, or in some other way exercised a supervising or antagonistic duty. As Lord Kenyon says, in *King* vs. *Pateman*, (2 T. R., 779,) "I do not think the offices of Alderman and Town Clerk are necessarily incompatible, for in some corporations Aldermen are not judicial officers. If an Alderman be also a Magistrate and the Town Clerk act ministerially under him, then indeed these two offices cannot be held by the same person. Now here it is a question whether the Town Clerk's accounts are not allowed by the Alderman. If they are, I think the two offices are incompatible. In the *King* vs. *Gayer*, (*supra*,) it seemed to be agreed that the offices of Justice of the Peace and Overseer of the Poor were incompatible, because the accounts of the latter are subject to the control of the former."

On the other hand, in *Rex* vs. *Jones*, (1 B. & Adol., 677,) the Court held that the office of Town Clerk, Clerk of the Peace and Prothonotary of the borough of Carmarthen were not incompatible with the office of a Common Councilman of the borough; for that the Common Council neither appointed such Town Clerk, nor paid him, nor had any power to make by-laws to regulate his fees nor to audit his accounts. Lord Tenterden here advances the definition of an incompatibility to be "where different persons filling two offices would be in relation of master and servant their offices are incompatible."—p. 679.

"The making a Justice of C. B. a Justice of B. R. determines and drowns the inferior authority of being a Justice of C. B. And it is impertinent that one may reverse his own judgment, as in this case he might, by error brought in B. R.; but the same person has

been Justice of C. B. and Chief Baron of the Exchequer, as Brooke, in the time of Henry VIII, and Starkie in the time of Henry VII. But a man may be Justice of C. B. and Justice in Oyer and Terminer, or of gaol delivery; for none of those Courts have controlment of the other." Knevit was Chief Justice and Chancellor together in the time of Edward III.—Vin. Ab., *supra.*

"So the grant of an office to one who has another office incompatible is not good, for the first office will thereby be void. As if a forester by a patent for life be made Justice in Eyre of the same forest, *pro hac vice*, the office of forester will be void; for it is incompatible, being subject to correction by the Justice in Eyre.—4 Inst., 310. A Bishop cannot have a benefice by *commendam* in his own diocese, for he cannot visit himself.—1 Sid., 305. But the Chief Justice of C. B. being made keeper of the great seal continues Chief Justice.—Cro. Car., 600. So, by custom, the same person may be a Judge and an officer to execute process, for he acts in different respects.—Cro. Car., 138. (Com. Dig., Office, B. 6. Office incompatible—what shall be such.) A man shall lose his office if he accepts another incompatible, as if the one be under the control of the other.—*Ib.,* K. 5; Dy., 197, b.

That the acceptance of an incompatible office is held to be a *resignation* by implication appears clearly from the current of the English cases, where it is held that it does not operate as an avoidance in any case where the party could not divest himself of that office by his own act and without the concurrence of another authority to his resignation, unless such authority be privy and consenting to the second appointment.—*Rex* vs. *Patteson,* 4 B. & Adol., 9, and cases there cited. In this country the better opinion is that all resignations are absolutely within the discretion of the officer, and the doctrine, for this reason, does not apply in the American cases, but the reason of the thing remains in equal force.

In the United States the question as to incompatibility of offices was early determined by statutes in the several States, and the occasions for the application of our doctrine were rare. A case will be found in 2 Oregon, 246, (*State* vs. *Hoyt,*) where the offices of Councilman and City Marshal were held to be incompatible because the Councilman passed upon the accounts of the Marshal, and it would not be competent for him to pass upon his own accounts and vote money out of the city treasury into his own pocket.

In *Howland* vs. *Luce*, (16 Johns., 136,) it was held that the offices of District Clerk and Collector of a school district were not incompatible. The ground is not stated, but it is clear that whilst both offices are responsible to a common Board they are independent of each other.

The eighth Section of the second Article of the Constitution of Pennsylvania provides that "no member of Congress from this State, nor any person holding or exercising any office of trust or profit under the United States, shall at the same time hold or exercise the office of Judge, Secretary, Treasurer, &c., or any office in this State to which a salary is by law annexed, or any other office which future Legislatures shall declare incompatible with offices or appointments under the United States." Whilst he held the office of Recorder of the city of Philadelphia, Judge Dallas was appointed District Attorney for Pennsylvania. The issue was made that the tenure of these offices by the same person at the same time was incompatible. Shippen, C. J., held that although the office of Recorder was judicial he was not a Judge in the State, within the meaning of the Constitution, and that the offices were not incompatible.— *Com.* vs. *Dallas*, 4 Dall., 230. The reason is plain : Judge Dallas was a Magistrate of the corporation, not of the State, and his office, therefore, did not come within the constitutional inhibition; and, independently of the inhibition, the offices were not inherently related to and inconsistent with each other. This, although, palpably, it would often occur that whilst he would be in the discharge of the duties of the one he would thereby be prevented from discharging the duties of the other, and, "from the multiplicity of business in them, the offices could not be executed with care and ability by the same person," as Bacon has it.

The application of the doctrine, thus clearly established in the cases in this country and in England, is obvious. The term incompatibility, as defined at common law, does not apply to the offices of Solicitor of a circuit and Representative in Congress. There is no relation whatever between them. It is impossible to refer to offices more essentially different and foreign to each other in every respect. There is no "controlment" of the one over the other; neither is the master, neither the servant, and the duties of the one can never impinge upon or conflict with the duties of the other. It may happen, or it may not, that to fill the one may cause the officer to neglect at times to perform the duties of the other. Of this .

hereafter. But this is a mere accident and does not touch upon the relation, nature or inherent qualities of the offices. They are wholly independent of each other, and of them the idea of incompatibility cannot be predicated. It is simply a bold, naked misapplication of the term. Then, whatever there may be in the argument that his right is determined by the express provisions of the fundamental law, there is nothing in the clearly-ascertained principle of the common law to impeach the title of this defendant to his office.

III. It is not denied that offices may be inconsistent, so that the acceptance of the one may be treated as an abandonment of the other. This, from the necessity of the case, where the officer has permanently and forever put it out of his power to discharge any of the duties of his office, either by himself or another. There is, then, at least in analogy to corporate offices, a cause of amotion. So if an Alderman removes out of the borough, and upon express summons refuses to attend the service there.—4 Mod., 36. "But an Alderman with his family having left the borough for four months is not a good cause."—Com. Dig. Franchise, F. 31. The disability must be permanent, not temporary and accidental, and may exist without reference to the acceptance of any other office. A mere absence, with the avowed purpose of not returning during the term, would supply the case fully; whilst a temporary absence, upon whatever pretext, especially when attended by an avowed purpose to return within a limited time and an adequate provision for the discharge of the duties of the office by deputy in the meantime would not supply the case. This is no more than any other absence, from any cause whatever, and occurs in every department of the public service every day. Cases in Iowa and Indiana illustrate these points; also, 1 Dillon Mun. Corp., § 167.

In Dillon as cited it is said, note to § 166, that "incompatibility in offices exists where the nature and duties of the two offices are such as to render it improper, from considerations of public policy, for one incumbent to retain both. *It does not necessarily arise when the incumbent places himself, for the time being, in a position where it is impossible for him to discharge the duties of both offices.*"—*Bryan* vs. *Cattel*, 15 Iowa, 538.

Cattel's case was that of an incumbent of the office of District Attorney—the same as Solicitor in this State—and Captain in the volunteer service of the United States for a limited period. Here

they were held not to be incompatible, although certainly they materially interfered the one with the other during the temporary tenure of the latter office.

In contrast with this is the case of *State* vs. *Allen*, 21 Ind., 516. The decision contains a statement of the case. After disposing of technical questions as to the form of appeal, and holding that " an office may be resigned by parol, and of course acts may speak that resignation," the Court say:

"Now, whenever the Auditor voluntarily *permanently* disables himself to perform the duties of his office, he, by that act, constructively resigns the office by abandonment of it. A temporary disability to discharge the duties of the office might not of itself create a vacancy. In an office capable of being served by deputy the deputy of the principal might doubtless continue to act during the temporary disability of the principal; and if no deputy had been appointed, perhaps the sureties of the principal might appoint. See *The State* vs. *Pidgeon*, 8 Blackf., 132. But a disability designed to continue for the whole term of office must vacate the office. And the question now arises, did the Auditor in this case, by enlisting as a private soldier in the army of the United States for three years or during the war, thus disable himself? Of this we have no doubt. What did he undertake, what did he agree to do, by that enlistment? In what situation did he place himself? He placed himself in the service of the Government of the *United States*, and agreed, yes, legally bound himself, to leave, not only the County of Vigo, but the State of Indiana, and remain absent, if required, for three years, devoting his entire time to the service of the United States in parts remote from the State of Indiana. This we judicially know, because we know that the Government was not enlisting soldiers to serve in Vigo County nor in the State of Indiana; for there was no rebellion existing within those limits to be put down by an army. Allen not only undertook to leave the State, and did leave it, but he further deprived himself of the power to return, of his own volition, for a period of three years. The soldiers, as we judicially know, were enlisted for the war which was being carried on in the Southern States; and while we concede the nobleness and patriotism of the spirit which prompted the defendant to enlist, still we cannot allow such considerations to control in the decision of a question of law. Legal decisions should not rest upon the impulses of the hour, but upon principles of per-

petual application.   The proper way to test the decision in this case is to turn ourselves back to a period prior to this war, and to suppose an officer to be recruiting for the regular army; to suppose, further, that Allen, then the Auditor of Vigo County, enlists for three or five years in that army and is marched off to a frontier military post of the United States; would anybody say, in that case, that he had not abandoned the office of County Auditor? Such, in law, is this case. See *Kerr* vs. *Jones*, 19 Ind., 351.   It could make no difference that Allen should afterwards and before the expiration of the term of his enlistment get released therefrom, that fact being a mere accident; the vacancy having once become complete by abandonment could not be refilled by an accidental voluntary or forcible reoccupancy.—See *Rex* vs. *Harris*, 4 Barn. & Ad. 936; *Page* vs. *Hardin*, 8 B. Mon., 648."

Now, whilst attending Congress, the defendant was absent forty days.   The circumstances of his election show that it was intended by the people that he should hold both offices, and the circumstances of his absence avow his purpose to retain the title thus conferred upon him.   He received the permission of the Court for this temporary absence from duty, and his duties were efficiently discharged meantime by a substitute, appointed for the purpose according to law and at no charge to the public.   It materially reinforces the argument presented in the outset to note that, whilst the Constitution nowhere else contemplates in terms the failure of any other officer to discharge his duties, it takes especial care to meet the contingency of the Solicitor's absence from his post of duty, (and invites him to the enjoyment of other offices; why not?) by providing that in all cases where he " fails to attend and prosecute according to law the Court shall have power to appoint an attorney *pro tempore.*"—Art. IV, § 29.   This is on all-fours with Cattel's case, (15 Iowa, 538,) except that in Cattel's case the absence was for at least a year ; and our case has the added force of the argument that the Constitution has by strong implication declared that a " failure to attend and prosecute " shall not operate to vacate the office.

IV.   Statutes are sometimes merely declaratory, and from them nothing of legislative intention can be inferred.   Again, they operate to alter and amend the common law, and in such case are regarded as a legislative declaration both of the remedy and the mischief.   Then the judicial mind cannot avoid the implication,

whatever it may be worth in clear cases, that the Legislature regarded the law existing at the time such as so render necessary the amending or repealing effect of the statute.

In 1787, by "An Act for regulating and fixing the salaries of several officers," (No. 1368,) the General Assembly of this State provided "that no officer heretofore elected, or hereafter to be elected, to any pecuniary office in this State, above one hundred and fifty pounds, shall hold any other office of emolument under this or the United States."—5 Stat. at Large, 21. To illustrate : The question occurs, if these offices are incompatible at common law, where the necessity of the statute ? No penalty is affixed, and nothing appears beyond the purpose of altering the pre-existing law in this particular. Now, as if the new Constitution did not of itself operate a repeal by implication, this statute has been specially repealed by the General Assembly.—Gen. Stats., "*seventeen hundred and eighty-seven*," p. 798. And in the same line of argument, may not the repeal be regarded as a legislative declaration of intention that thereafter these offices shall be regarded as not incompatible, and that no disability should exist against the holding of both by the same person at the same time ?

V. The doctrine presented by the plaintiff here is in " derogation of private right," and all presumptions are against it. Moreover, it must be made to appear clearly and conclusively, " to support an application for a *quo warranto* information for exercising a public office, after having accepted a second incompatible one, the affidavits must *clearly show* that the two offices are incompatible."— Cole, \*157 ; *Rex* vs. *Patteson*, 4 B. & Adol., 9 ; *Com.* vs. *Binns*, 17 Serg. & Rawle, 219. An extract from the opinion of the Court in this, a Pennsylvania case, will be deemed specially in point, whilst the entire case is ably and exhaustively discussed. The Court says, p. 226 :

" This identical case may not have been decided, but the principle is settled, if anything of the kind can be said to be settled. The question of incompatibility is no new question. The established rule is to give the strictest possible construction to every part of the Constitution and to every Act of Assembly declaring State offices incompatible with offices or appointments under the Federal Government, or declaring different State offices incompatible with each other, and never to hold anything to be within the prohibition unless expressed and named, and to take in no possible

case by construction. This principle has been established by every authority known in the land—by the people in their elections ; by the Legislature in their appointments ; by each separate branch of the Legislature in their solemn decisions ; by the Governor in his appointments, and by the Courts of law in their judgments. The reasons why the rule has become so · deeply fixed as never to be varied from in any case are not, I think, for us to examine. If they were, I should be inclined to dissent from one of the counsel of Mr. Binns, who has adduced the maxim which requires a strict construction of all penal laws. There appears something in that too technical for the production of such universal effect. I would rather believe the effect to be produced by the apparent harshness of taking (unless where some plain and unequivocal precept requires it) from the people or from the agents of the people their power of entrusting the public business to those men whom they .may think most fit to be trusted." * * * *

VI. It may be permitted to say that the defendant was elected to the office he now claims by the people of the two Counties constituting his judicial circuit by a decisive majority of over six thousand votes.

" Courts are anxious rather to sustain than to defeat the popular will."—1 Dill. Mun. Corp., § 136, and cases cited.

September 20, 1877. The opinion of the Court was delivered by

McIVER, A. J. This was an original proceeding, instituted in this Court by the Attorney General in behalf of the State to oust the defendant from the office of Solicitor of the First Circuit, upon the ground that he had " vacated, surrendered and forfeited " his said office of Solicitor by accepting the office of Representative in the Congress of the United States. The facts in the case are all conceded, and are as follows : The defendant, on the 7th day of November, 1876, was elected to the office of Solicitor of the First Judicial Circuit of this State for the term of four years, and, having duly qualified, was commissioned as such Solicitor on the 30th day of November, 1876, and thereupon entered upon the duties of his said office. That on the 7th day of November, 1876, the defendant was also elected to the office of Representative in the Congress of the United States for the Second Congressional District of this State for the unexpired term, to end on the 4th day of March, 1877, and on the 23d day of January, 1877, duly qualified and entered

upon his duties as such Representative, and thereafter discharged such duties until the expiration of the said term. It is also alleged in the defendant's anwer that "whilst the said defendant was discharging his duties as such Representative only one term of the Court of General Sessions was held in the First Judicial Circuit, that is to say, on the third Monday in January, 1877, for the County of Orangeburg, at which term the said defendant, with the concurrence and consent of the Circuit Judge of the said Court, failed to attend in person and prosecute, and the duties of the office were discharged in the name of the said defendant, as Solicitor, by an attorney appointed *pro tempore* by the Court according to law." Whether these allegations are, in fact, true, we did not deem it necessary to inquire, as, for the purposes of this case, they may be conceded to be true; but we do not see how they can in any way bear upon the issue involved in the case. The sole question is one of law,—whether the defendant, by accepting the office of Representative in Congress while he held the office of Solicitor vacated the office of Solicitor. It was very properly conceded in the able and ingenious argument of the counsel for the defendant; and the proposition is clearly demonstrated by the authorities cited in the briefs of counsel, that, at common law, where a person holding a public office accepts another public office incompatible with the first, such acceptance is an implied resignation of the former, and it is thereby vacated.

It is contended, however, that by the express terms of the Constitution of this State this rule of the common law has been abrogated, and that there is nothing to prevent one from holding at the same time two incompatible offices in this State. The provisions of the Constitution which are relied upon to support this proposition are Section 31, Article I, declaring that "every inhabitant of this Commonwealth possessing the qualifications provided for in this Constitution shall have an equal right to elect officers and *be elected to fill public office*," and Section 7, Article VII, declaring that "every person entitled to vote at any election shall be eligible to *any* office which now is, or hereafter shall be, elective by the people in the County where he shall have resided sixty days previous to such election, *except as otherwise provided in this Constitution* or the Constitution and laws of the United States," read in connection with various other Sections in which officers of the three great departments of the government—legislative, executive and judicial—are

prohibited from holding other offices, viz.: Article I, Section 26; Article II, Section 28; Article III, Sections 3, 5 and 8; Article IV, Section 9; and other Sections declaring various disqualifications for office, viz.: Article I, Section 32, disqualifying any person who shall be engaged in a duel; Article II, Section 10, requiring a residence of three months in the County, instead of sixty days, before one shall be eligible to a seat in the House of Representatives, and requiring that Senators shall be at least twenty-*five*, instead of twenty-*one* years of age; Article IV, Section 10, declaring that no person shall be eligible to the office of Judge unless he is at the time of his election a citizen of the United States, of the age, at least, of thirty years, and a resident of the State for five years next preceding his election; Article IV, Section 30, and Article IX, Section 15, disqualifying certain officers who may have been guilty of defaults in office or of embezzlement of the public funds; Article VIII, Section 2, disqualifying those who are disqualified by the Constitution of the United States until such disqualification shall be removed by the Congress of the United States, and also persons while kept in any alms house or asylum or public prison, and persons of unsound mind; and Article XIV, Section 6, disqualifying every person " who denies the existence of the Supreme Being."

From these provisions it is argued that as the Constitution has declared every person entitled to vote eligible to *any* office elective by the people, with the exceptions above specified, that it necessarily follows that unless the person in question comes under some one or more of the exceptions named that his right to hold any office cannot be questioned, and the fact that he holds one office is no bar to his holding *any* other office, because, if it were, another qualification, not prescribed by the Constitution, would be added to those required by that instrument. One defect in this argument is that it assumes that the word " *any*," in the seventh Section of Article VIII, means all, every, or any two or more, or something equivalent thereto, and that when the Constitution declares that a person possessing certain qualifications is eligible to " *any* " office it means that he is eligible to all or at least any two or more offices at the same time. This construction does not seem warranted by any rule that we have been enabled to apply. A more serious objection, however, to this argument is that it fails to distinguish between the qualifications required for *holding* an office and those required for *election to office*. It is very manifest that the two things are entirely

VOL. IX—18

distinct and different.  A person while sitting as a member of the General Assembly is *eligible* to the office of Judge, but he is incapable of *holding* both offices at the same time.  The Governor of the State is *eligible* to the office of United States Senator, but he cannot *hold* both offices at the same time.  Now, it is very clear, from the express terms of the two Sections under consideration, that they relate exclusively to *eligibility* for office and not to *holding* an office.  In Section 31 of Article I the language is "shall have the right to elect officers and *be elected* to fill public office;" while in Section 7 of Article VIII the words are "shall be *eligible* to any office."  So that, while it may be conceded that, under the provisions of the Constitution of this State, a person holding one public office is *eligible* to another public office incompatible with the former, the question would still remain as to what effect the acceptance of the latter would have upon the right to *hold* the former.  It may have the effect of vacating the former without in any manner abridging the right secured by these Sections of the Constitution; for, as we have seen, the only right secured is the right *to be chosen* to office, and this right would not be interfered with by declaring that *after he has been chosen to and has accepted* the incompatible office he has thereby vacated the former.

Again, it is argued that whilst there is no provision in *general* terms restricting the right declared by Section 31, Article I, and Section 7, Article VIII, to a single office, there are several exceptions limiting the right to hold more than one office in particular instances, as appears by the various Sections above cited, and that under the maxim *expressio unius exclusio alterius*, the construction must be that in all but the particular instances named the right to hold two offices at the same time is guaranteed by the Constitution.

This argument, besides ignoring the distinction above pointed out between being *eligible* to office and *holding* an office, proceeds upon the assumption that the words "except as otherwise provided in this Constitution" relate only to cases in which certain officers, viz., those of the great departments of the government—legislative, executive and judicial—are prohibited from holding more than one office at the same time; whereas it seems to us to be the proper construction that those words should rather be applied to those causes which are declared by the Constitution to constitute ineligibility for *any* office, *e. g.*, atheism, dueling, embezzlement, unsoundness of mind, confinement in alms house or prison.

Again, this argument assumes that the Constitution, in the Sections referred to as containing exceptions to the general right guaranteed by Section 31, Article I, and Section 7, Article VIII, is dealing with the right to hold two *incompatible* offices, while in fact it is dealing with the right to hold *any* two offices, whether incompatible or not.   Hence, to give full force to the maxim, the result would be that the Constitution, having declared that, *in certain instances*, it should not be lawful for a person to hold at the same time *any* two, not any two *incompatible* offices, in all other instances it left the rule as it stood at common law, to wit : that while any person might hold two offices at the same time which were *not* incompatible, he could not hold two offices at the same time which *were* incompatible.   An expression of intention to change in *one* particular excludes the idea of an intention to change in any other particular.   For, as remarked by Judge Cooley in his work on Constitutional Limitations, 60 : " Constitutions are to be construed in the light of the common law and of the fact that its rules are still left in force.   By this we do not mean that the common law is to control the Constitution or that the latter is to be warped and perverted in its meaning in order that no inroad, or as few as possible, may be made in the system of common law rules, but only that for its definitions we are to draw from that great fountain, and that in judging what it means we are to keep in mind that it is not the beginning of law for the State, but that it assumes the existence of a well-understood system, which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes."   And in Potter's Dwarris on Statutes and Constitutions, 185, we read that " Statutes are to be construed in reference to the principles of the common law ; for it is not to be presumed that the Legislature intended to make any innovation upon the common law further than the case absolutely required.   The law rather infers that the Act did *not* intend to make any alteration *other* than what is specified, and *besides* what has been plainly pronounced ; for if the Parliament had had that design, it is naturally said, they would have expressed it."   This, though a rule of statutory construction, may well be applied to the Constitution ; for in the same book, at page 654, Judge Potter says : " There is a striking analogy and generally an entire harmony between the rules of interpretation of constitutions and those of statutes."

The framers of the Constitution of this State found that by the existing law, except as modified by the third Section of the Act of 1787, (5 Stat., 21,) a person might hold two offices at the same time, provided they were not incompatible, and by the provisions relied upon they proposed to make a change. What was the change intended? Certainly, not that the particular officers specified should not be allowed to hold at the same time two *incompatible* offices, for that would have been no change at all. It must then have been the intention to declare that, in certain specified instances, the same person should not hold at the same time *any* two offices, not any two *incompatible* offices, and that with regard to holding incompatible offices they left the law as they found it. These remarks will also dispose of the argument drawn first from the enactment and next from the repeal of the Act of 1787, above referred to, the language of which is "that no officer heretofore elected or hereafter to be elected to *any* pecuniary office in this State, above one hundred and fifty pounds, shall *hold any* other office of emolument under this State or the United States." This Act, it will be observed, applied only to a certain class of officers, to wit: those who were *elected* to offices of *emolument* exceeding a specified sum, and the prohibition was against *holding*, not being *eligible* to *any* other office, not any other *incompatible* office. Hence the argument that the enactment of this statute might be regarded as an indication that in the absence of such a statutory provision there was no law to prevent one from holding at the same time two *incompatible* offices, or that its repeal afforded an indication of the legislative will that thereafter a person might at the same time hold two *incompatible* offices, loses all its force.

In reference to the argument drawn from the maxim *expressio unius exclusio alterius,* we find, in the same Section from which it is cited, (1 Story on Const., § 448,) that the distinguished author advises caution in the use of such maxims in construing the Constitution. He uses this language: "These maxims, rightly understood and rightly applied, undoubtedly furnish safeguards to assist us in the task of exposition; but they are susceptible of being applied, and, indeed, are often ingeniously applied, to the subversion of the text and the objects of the instrument. The truth is, that in order to ascertain how far an affirmative or negative provision excludes or implies others, we must look to the nature of the provision, the subject-matter, the objects and the scope of the instrument.

These, and these only, can properly determine the rule of construction.    *    *    *    *    In relation, then, to such a subject as a constitution, the natural and obvious sense of its provisions, apart from any technical or artificial rules, is the true criterion." These views of Judge Story are quoted with approval by Judge Potter in his edition of Dwarris on Statutes, pp. 674–5, and in Cooley on Constitutional Limitations, p. 83, we find similar views.  Now, the various Sections of the Constitution referred to, in which certain officers are prohibited from holding more than one office, all relate to the heads of one or the other of the three great co-ordinate departments of the government; and as the framers of the Constitution were evidently impressed with the importance of keeping these departments separate and distinct from, and, as far as practicable, independent of each other, after first declaring, in general terms, by Section 26, Article I, that "in the government of this Commonwealth the legislative, executive and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other," they very naturally, when they came to prescribe the qualifications for office in the heads of these several departments, applied to each the general principle, previously declared applicable to all, so that, as far as possible, no room for construction should be left.  Especially was this desirable in reference to the legislative department, in which each house is made the "judge of the election returns and qualifications of its own members"—judges in their own case, as it were.  Hence, perhaps, the difference in the phraseology used in reference to this department, for we see that, while one may be *eligible* to the office of Governor or Judge whilst he holds another office, though he is prohibited from *holding* any other office while Governor or Judge, with certain unimportant exceptions in regard to the Governor the language in reference to the legislative department is different. "No person shall be *eligible* to a seat in the General Assembly whilst he holds any office, &c.    *    *    *    *    And if any member shall accept or exercise any of the said disqualifying offices he shall vacate his seat."

Now, looking "to the nature of the provision, the subject-matter, the object and scope of the instrument," as we are advised by Judge Story to do, it seems to us much more natural to suppose that the framers of the Constitution, in the provisions relied upon,

intended merely to put into practical operation the fundamental idea that the three great departments of the government were to be kept separate and distinct, rather than that, by declaring that a Judge or a member of the General Assembly should not hold any other office, they intended to convey the idea that every other officer should be at liberty to hold at the same time as many offices as he could succeed in obtaining, either by election or appointment, whether such offices were compatible or incompatible; especially when, by such construction, the rule of the common law would be abrogated by implication merely. We must, therefore, conclude that the provisions of the Constitution relied upon for the purpose do not abrogate the rule of the common law in this particular.

The only remaining inquiry, then, is whether the offices of Solicitor and Representative in Congress are incompatible. It seems to be supposed that, in order to render two offices incompatible, there must be some such relation between them as that of master and servant—that the one must have " controlment of the other," or that the one must be charged with the duty of auditing or supervising the accounts of the other, or that the one must be chosen by or have the power of removal over the other. Now, while authorities have been cited to show that offices bearing such relations to each other have been held to be incompatible, they merely afford *instances* of incompatible offices, and do not furnish, nor do they pretend to furnish, *definitions;* and therefore it does not by any means follow that these are *all* the instances in which offices can be said to be incompatible. For example, the case of *Rex* vs. *Jones,* 1 B. & Adol., 677, (20 E. C. L. R., 467,) is cited apparently for the purpose of introducing what is called " *a definition* " of incompatible offices by Lord Tenterden. But it is apparent, not only from the context, but from the very phraseology quoted, that his remark was not intended as a definition but merely as an instance or an illustration of what would be incompatible offices. The question in the case was whether the offices of Town Clerk and Common Councilman of the borough of Carmarthen were incompatible. The only ground upon which it was claimed that the two offices were incompatible was that the Town Clerk was required to keep minutes of the proceedings of the Common Councilmen, and it was held that "there is nothing inconsistent in one member of a body noting down the acts of the body." In discussing the case Lord Tenterden uses the language cited : " Where different persons

filling two offices would be in the relation of master and servant to each other, those offices cannot be held by the same person ;" which is obviously used as a mere illustration, for he proceeds to say: "Thus, if the Common Council had the power of fixing the Town Clerk's salary or of removing him, the offices would be incompatible; but here there is no power of amotion." As well might the language just quoted be cited to show that Lord Tenterden's definition of incompatible offices is where one has power to fix the salary of another or where one has the power to remove the other from office. In this very case another one of the Judges, (Taunton, J.,) delivering a separate concurring opinion, gives another instance or illustration of incompatible offices ; for says he : " *Verrior* vs. *The Mayor of Sandwich,* (1 Sid., 305,) *Milward* vs. *Thatcher*, (2 T. R., 81,) and *Rex* vs. *Pateman,* (2 T. R., 777,) are clearly distinguishable from the present case. The offices of Mayor, of Jurat and of Alderman, in these cases, were judicial, and therefore incompatible with that of Town Clerk," implying plainly that he considered the offices incompatible, not because the one was subordinate to the other, but because the one was judicial while the other was ministerial.

In *Rex* vs. *Tizzard,* (9 B. & C., 418,) Bayley, J., gives still another *instance* of incompatibility, when he says : " I think that the two offices are incompatible when the holder cannot in every instance discharge the duties of each." By which he probably means that when the duties of the two offices are such that the performance of the duties of the one necessarily involves the neglect of the duties of the other, then the two offices would be incompatible. Turning to the cases in this country, we find that in *Magil* vs. *Stoddard,* (25 Conn., 565,) the office of Constable of a town was held incompatible with that of Justice of the Peace. In 3 Maine, 486, the Supreme Court of that State, in answer to the Senate, says " that the office of Justice of the Peace is incompatible with that of Sheriff, Deputy Sheriff or Coroner." And in *Stubbs* vs. *Lee,* (64 Maine, 195,) reported also in 18 Amer. Rep., 251, the office of Trial Justice was held incompatible with that of Deputy Sheriff. It appears, therefore, that the books furnish us with other *instances* of incompatible offices besides those cited in the argument. What, then, does constitute incompatibility in offices ? In 5 Bac. Abr., Title Offices, K, we find the rule laid down, upon the authority of Lord Coke, in these words : " Offices are said to be

incompatible and inconsistent, so as to be executed by the same person, when, from the multiplicity of business in them, they cannot be executed with care and ability; or when their being subordinate and interfering with each other it induces a presumption they cannot be executed with impartiality and honesty." And in Dillon on Municipal Corporations, in a note to Section 166, it is said that "incompatibility in offices exists where the nature and duties of the two offices are such as to render it improper, from considerations of public policy, for one incumbent to retain both." Apply either one of these definitions to the case in hand and it is very manifest that the two offices in question are wholly incompatible. It certainly needs no argument to show that "the multiplicity of business" in each of these offices is such as to render it not only impossible for the same person to perform the duties of both "with care and ability," but impossible often, and very often too, to perform them at all. It is equally certain that the nature and duties of these two offices are such as that every consideration of public policy renders it improper for one incumbent to retain them both, and it is none the less certain that the duties of the two offices are such that the performance of the duties of the one necessarily involves the neglect of the duties of the other. The fact that in this particular case the defendant accepted the office of Representative in Congress for an unexpired term, which happened to be of very short duration, and the fact that the public suffered no immediate detriment in this particular instance, cannot alter the principle applicable to the case.

Without considering in detail the various duties of the two offices, the briefest examination of some of these duties will be amply sufficient to demonstrate the propriety of the foregoing observations. Here are two offices held under two distinct governments; the duties of the one are to be performed in Washington, while those of the other are to be performed in this State. To perform the duties of the one the officer must be in Washington, while to perform the duties of the other he must be in this State, and that, too, at the very time when the duties of the other call him to Washington; for we are bound to know, judicially, that the sessions of Congress cover the same time as that appointed by law for the sessions of some, and, it may happen, of all the Courts of the First Circuit. The Constitution of the United States requires the one to be in Washington for a large part of the time, and at *all*

times to be subject to the call of the proper authorities there, while the Constitution of the State requires the other to " *reside in* " his circuit, not merely to be a *resident of* his circuit,—the former phrase being considered by some Courts as more significant of an intention that the officer should *continuously remain* in his circuit than the latter. See *State* vs. *Allen*, 21 Ind., 516. And so important was this regarded that the Legislature, by the Act of 24th March, 1876, (16 Stat., 151,) specially declared " that in case any Circuit Solicitor shall cease to reside in his circuit his office shall be deemed and taken to be vacant." By an Act of the Legislature of this State (Gen. Stat., Chap. XVI, Title V, § 41, p. 111,) the Solicitor is " *specially* charged with the *prompt* and vigorous prosecution " of certain offenses, and is made liable to arrest, trial and conviction for a failure to perform this duty, which he must necessarily fail to perform if he perform his duty as a member of Congress. But, under the provisions of the Constitution of the United States, (Art. 1, § 6,) he would be, as a member of Congress, exempt from arrest during his attendance upon Congress and while going to and returning from the same for an offense of this kind. So that by reason of his obligations as an officer of the State government he may become liable to arrest and imprisonment, and at the same time by reason of his privileges as an officer of the Federal government he would be exempt from such arrest and imprisonment. As was well said by the Attorney General in his brief, " The one office prevents him from performing the duties of the other and shields him from punishment for such non-performance." By the laws of the State the Solicitor is required to attend the sessions of the Courts in his circuit, while by the Constitution of the United States a member of Congress is not only required to attend the sessions of Congress, but such attendance may be enforced in a very summary manner. In this very case, if the defendant had chosen to neglect his duties as member of Congress instead of those as Solicitor (for he necessarily had to neglect one or the other) and had attended the Court in Orangeburg at the January Term, 1877, the Sergeant-at-Arms of the United States House of Representatives might have arrested him in the very presence of the Court, while engaged in the most important duty, and carried him to Washington. His oath as a member of Congress required him to be in Washington, while at the same time his oath as Solicitor required him to be in Orangeburg. He could not comply with the obligations of the one with-

out at the same time violating the obligations of the other. It will not do to say that a person in either of these offices may appoint a deputy and thus avoid the difficulties which have been, and many others which might be, suggested.

It has not been and will not be pretended for a moment that a member of Congress can perform his duties by deputy, nor do we think that it can be successfully contended that a Solicitor can, without special authority given by an Act of the Legislature, (and there is now no such Act) perform his duties by deputy. Indeed, in view of the provisions of Section 29, Article IV, of the Constitution of this State, declaring that "in all cases where an attorney for the State, of any circuit, fails to attend and prosecute according to law the Court shall have power to appoint an attorney *pro tempore*," it may be doubted whether even the Legislature could confer such a power upon a Solicitor after the Constitution had conferred that power upon the Court, but this is a question which we are not now called upon to decide. It seems that the Congress of the United States has thought it necessary, by special statute, to confer such a power upon the District Attorney, an analogous office to that of Solicitor, and in this State the Legislature by the Act of 1786–87, (Stat., 204,) specially authorized the Attorney General to appoint a deputy; and again upon the establishment of the District Court system a special clause was inserted in the Act, authorizing the Attorney General or Solicitor to conduct prosecutions in that Court by deputy.—Act of 1866, 13 Stat., 388.

This certainly warrants the inference that, without such special authority, such a power was not supposed to exist; and when we consider the nature of the duties incident to the office, requiring for their proper performance a high degree of skill and knowledge, and involving the exercise of the largest discretion, even in the gravest of issues, it is very obvious that the office of Solicitor is one of the highest *personal* trust and confidence, and that it does not belong to that class of offices in which the holder may appoint a deputy.—5 Com. Dig., Title Office, 56; 1 and 2 Jac. Law Dic., Title Office, 251–2. We are, therefore, of opinion that the offices of Solicitor and Representative in Congress are wholly incompatible, and that the defendant by accepting the latter vacated the former office.

In accordance with these views judgment of ouster has heretofore been entered against the defendant.

*Willard*, A. J., concurred.